Opinion delivered June 24, 1887.

No. 5405.

## J. J. LONG *v.* THE STATE.

THEFT—CONSPIRACY—EVIDENCE.—See the opinion and the statement of the case for evidence *held* sufficient to establish a conspiracy between the accused and two others to commit the theft, and therefore to have qualified, as evidence, certain statements inculpating the accused, made by the said parties before the consummation of the conspiracy.

APPEAL from the District Court of Uvalde. Tried below before the Hon. T. M. Paschal.

The conviction in this case was for the theft of five hundred and seventy-seven head of sheep, the property of B. C. Flowers. The penalty assessed against the appellant was a term of two years in the penitentiary.

J. W. Sansom was the first witness for the State. He testified that he lived at Uvalde Station in 1886. For ten months prior to the sixteenth day of September of that year, the defendant boarded at the house of the witness. Witness knew a Mexican named Nickenor Rodriguez. He had the said Rodriguez in his employ from about January 1, 1886, until September 16, 1886. On or about September 7, 1886, the defendant told the witness that the Mexican, Nickenor Rodriguez, had requested him to say to the witness that he had a sick brother in Eagle Pass, and that he wanted a week off in which to visit the said sick brother. The witness told defendant that he had just purchased some mutton sheep, and that they needed the immediate attention of an experienced hand, such as the Mexican, Rodriguez, was, and that he did not want to change hands under the circumstances, and could not let Rodriguez off. Defendant then said that Rodriguez had made a good, faithful hand to witness, working for him day and night, in good and bad season, and that he thought witness ought to give Rodriguez a few days in which to visit his sick brother. After considerable talk, and objecting because Rodriguez was the only hand perfectly familiar with the sheep range, witness reluctantly consented to give the man a few days off to go to Eagle Pass to see his sick brother, on condition that he would secure for the witness a competent hand to take his place. On the next morning Rodriguez brought the witness a young Mexican, and witness put him in charge of the sheep on the range. Rodriguez then asked if the witness wanted him to help load some sheep then ready for shipment. The witness replied that he did, and Rodriguez helped him. After the sheep were loaded, Rodriguez went off towards the town of Uvalde. Witness saw him in the town of Uvalde the next day. On or about the eleventh day of the month Rodriguez returned to witness's house in company with a large Mexican, who gave his name as Merijildo. They rode up to the house together, remained a short time, and rode off together in the direction

whence they came.  They traveled the road leading to Eagle Pass.

The witness next saw Rodriguez about three days later, which was the third day before the arrest of the defendant.  The witness did not know with whom, if anybody, Rodriguez came to his house on that day, nor with whom, if anybody, he left the house.  He next saw Rodriguez on the third day afterward, being the day on which the defendant was arrested.  He rode up to the pen where defendant and others were shearing sheep. Defendant was working near the barn.  When Rodriguez reached the corner of the barn, riding his own horse, he exchanged the evening greeting with witness, dismounted, and went to the stand where defendant was tying up wool, and helped defendant in his work.  When they had tied up all but a little of the wool defendant left his stand, going through the chute, followed by Rodriguez.  Rodriguez soon overtook defendant, and, as he passed him he punched defendant in the side with his elbow, and went on to the barn, which he entered.  Defendant waited around for some time, and followed Rodriguez into the barn. Witness then heard them talking, but in a tone of voice too low to make out what they said.  They talked in the barn for some time, and came out separately, several minutes elapsing between their exits.  Witness remained on the shearing ground until he counted the bundles of wool and the shorn sheep, and then went to his house.  The sun was then about three hours high.

Shortly after the witness got into the house, the defendant came in and asked him if he was going to use Rodriguez on that evening.  Witness replied that Rodriguez had not yet reported for duty.  He then told witnes that he wanted to use Rodriguez in separating his shorn from his unshorn sheep.  Witness replied that defendant was at liberty to so use the Mexican if he wanted to, and soon heard defendant tell Rodriguez to go to the flock and separate the sheep.  The sun was about two hours high when Rodriguez started off with some of the shorn sheep of the defendant.  About sundown the witness's attention was attracted by the approach of a very large herd of shorn and unshorn sheep.  The herd was being driven toward the witness's pens by Rodriguez and the large Mexican Merijildo.  Rodriguez was riding his own horse, and Merijildo was riding a black pony which belonged to the defendant.  They drove the sheep rapidly to the witness's place and penned them.  After penning the sheep Rodriguez and Merijildo dismounted, but witness did not know

what they did with the horses, though he thought they put them in the barn.   About this time Mr. Will Clark rode up to the pens. The witness did not see defendant when the Mexicans got to the pens with the sheep, but soon afterward he passed witness and went to the pens directly through the chute to the "cutting out" gate, and proceeded to cut the shorn sheep into one pen and the unshorn sheep and goats into another.   He passed the Mexicans without speaking, so far as the witness observed, went through the sheep to the cutting out gate and proceeded at once to cut the shorn sheep out.   The Mexicans were then between witness and defendant, who were about fifteen steps apart. While defendant was cutting out the sheep the witness, with whom Clark then was, had some conversation with the Mexicans, but he did not think defendant could hear what was said, on account of the noise.   He asked the Mexicans who owned those sheep, and they referred him to the defendant for information.   Witness then called to defendant, asking him if he knew who owned those muttons.   Defendant made no reply. Clark suggested that defendant could not hear on account of the noise.   Witness and Clark then went to the cutting gate where defendant was.   Witness repeated his question to defendant, and he replied that he did not know who owned the sheep.   Witness then remarked that he supposed they were stray sheep, lost by somebody en route to a market, and told defendant that, if anybody came along inquiring for them, to purchase them for him at two dollars a head, if he could.   Defendant replied that he would do so.

The witness and Clark then left the pen together.   Before reaching the house witness made some remark about the sheep, and Clark replied that he thought the big black Mexican had charge of them.   Witness then told Clark that he, witness, had to go to church with his family.   Clark spoke of going back to his ranch, but witness requested him to remain at his house on that night.   Witness and Clark then went again to the Mexicans, and witness again asked them about the sheep, and they again referred him to the defendant.   Defendant was not then in hearing distance.   Witness and Clark then separated, witness going to the house, and Clark to the cutting gate, where the defendant still was.   After a little while the witness went out to the cutting gate and found Clark and defendant sitting on the fence.   They were not then talking.   Witness made some remark about the muttons being fat.   Clark made an estimate

of the number of the sheep, and asked witness how many he thought there was in the flock. Witness estimated them as be-tween five and six hundred. Thereupon the defendant said that they numbered six hundred and seventy-five. If the defendant said anything else while the sheep were at the pens, than as stated, the witness did not hear him. If he looked either the witness or Clark in the face a single time while the sheep were in the pens, the witness, who observed him closely, did not know it. He appeared to be oppressed and uneasy, and looked guilty.

The witness had a conversation with the defendant after Rod-riguez started off with his shorn sheep. Defendant spoke of how much his clip would yield him, and of his board. He said, in effect, that he had, or ought to have, about seventeen hundred head of sheep, and that, if they did not clip him two and a half pounds of wool to the head, he would send them back down the country. Witness knew, as a matter of fact, that defendant had about one thousand head of sheep. Prior to this time the de-fendant told witness that he had arranged with Newt. McKin-ney to take his, defendant's, sheep on the shares, and that, as soon as he had sheared his sheep and raffled his fine mare, he intended to leave the country. The sheep penned by the Mex-icans on that evening numbered between six and seven hundred. At least that many were left in the custody of the witness by the sheriff after the arrest of the defendant. When the witness left home on that evening to go to church, the shorn sheep and goats were in a pen separate from the unshorn sheep, but they were gone when he returned and took charge of the others for the sheriff. Witness did not then know who owned the sheep. They were branded F in tar. Two days later Mr. Flowers came to witness's house and claimed and recovered the sheep. About eleven o'clock on that same night the witness saw the defend-ant, and the Mexicans Rodriguez and Merijildo, at the pen gate. They were then in the custody of Sheriff Baylor and his posse of three men. Defendant's bay mare and his black pony, then in the possession of Merijildo, were among the horses in the crowd.

Cross examined, the witness said that the reason assigned by Rodriguez for not applying in person to witness for leave of ab-sence to go to Eagle Pass to see his sick brother was that he could not understand the witness very well. Rodriguez was working for witness, but may have done odd jobs for defendant. He knew that Rodriguez some times rode defendant's horses. Several persons, including Ben Towerly and William Mitchell,

were present when Rodriguez went to the stand and helped defendant tie up his wool. Defendant kept his wool sacks, tar and twine in the barn. Witness could not say whether any body was in the barn when it was entered by defendant and Rodriguez. Rodriguez was at the stand but a short time before he and defendant went to the barn. They remained in the barn but a short time. If defendant brought any wool sacks with him when he came out of the barn the witness did not see them. If defendant did any more work at the pen after he and Rodriguez came out of the barn, the witness did not know it. When the witness first saw the defendant after the Mexicans drove the sheep to the pen, he was between the house and the pen, going towards the cutting gate. When the defendant replied to witness's question, asked the second time, as to who owned the sheep, he said: "I do not know." He did not say "they are not mine." The pen described was used conjointly by witness and defendant. At the time of defendant's arrest, witness owned about two hundred mutton sheep. Mutton sheep were altered male sheep over four years old. Witness did not think that the defendant had any mutton sheep in his flock at that time. About two weeks before his arrest the defendant said something about his intention of shipping a couple of hundred mutton sheep. He spoke of that intended shipment two or three times. Witness did not understand him to say that he intended to ship a couple of car loads, although he may have said car loads instead of hundreds. Two ordinary single decked car loads would be about two hundred sheep. A double decked car carried about as many again as a single decked car. Witness denied that, near the Uvalde depot, during the last term of the district court, he told Doctor Taylor Hudson that, when he asked defendant about the sheep and who owned them, defendant replied that he "did not know, but that they did not belong to him." He may have said to Hudson that he understood from defendant that he did not claim the sheep. Witness knew that defendant did not claim to own the sheep, but he did not hear defendant say, in Clark's presence: "They are not mine." Defendant owned about two hundred head of goats at the time of the alleged theft. Witness could not say how many unshorn sheep the defendant had, but he, witness, sheared about two hundred for him after his arrest. Witness denied that he ever told Doctor Hudson that, when defendant asked him for leave of absence for Rodriguez, he said that he had lent Rodriguez his

horse to ride to Eagle Pass. Rodriguez was now in the penitentiary serving a life term. Merijildo was in the county jail of Uvalde county, awaiting trial for this offense.

Re-examined, the witness stated that the Doctor Hudson spoken of on cross examination was the defendant's brother-in-law. On the day of the conversation spoken of, Mr. Baker, of counsel for the defense, brought Hudson in his buggy to see witness. Referring to the sheep transaction, Hudson said that he would not have had the thing to happen for ten thousand dollars, but he made no offer to pay witness to suppress testimony. He merely asked witness to be as lenient with defendant as he conscienciously could. It was the understanding of the witness that Rodriguez was now confined in the penitentiary for the murder of the herder who was in charge of the sheep when they were taken. Defendant, at the time of his arrest, had sheared something over eight hundred head of his sheep. The two hundred head afterward sheared for him by the witness completed his herd of something over one thousand head. Defendant's sheep were all poor, and none in a condition to ship. Defendant's sheep frequently ranged over the country in the direction from which the Mexicans brought the Flowers sheep to the pen.

Henry W. Baylor, sheriff of Uvalde county, was the next witness for the State. He testified, in substance, that he received some information through Mr. Pulliam and Mr. Newton about the sheep transaction on the night of September 16, 1886, and repaired to Captain Sansom's house at once, arriving there about eleven o'clock. He found Mr. Nemmo at Sansom's sheep pen or corral. Just as witness arrived he met the Mexican Rodriguez coming out of the corral on defendant's fine bay mare. He stopped Rodriguez and asked him whose mare he was riding. He replied that the animal belonged to the defendant. Witness then asked him where the defendant was. Receiving his reply, witness went to Sansom's house, but did not find defendant. Just as he started back to the corral he saw the defendant coming toward the house from a west direction. Witness told defendant that he had just stopped a Mexican on his mare. He replied that he had loaned the animal to the Mexican. The witness then told the defendant that he had heard about the sheep and had come to see about them, and asked defendant who brought them there. He replied that a Mexican did. Witness asked him what Mexican, and he replied that he did not know,

but that it was one of the several Mexicans whom he had employed to shear sheep for him. The witness thereupon arrested the defendant. He had no warrant or other process for the arrest of defendant. Just after the arrest of defendant was made, the Mexican Merijildo rode up on the defendant's black pony. Witness then told Captain Sansom to take charge of the sheep, and went to town with his prisoners. Witness did not go to Sansom's to arrest defendant, but to examine into the sheep transaction. The arrest of defendant was made after the conversation detailed on direct examination.

Fred Volcker testified, for the State, that he was the railroad station agent at the depot at Uvalde, in Uvalde county, Texas. About two weeks before his arrest, the defendant came to the depot and asked witness the rate on sheep cars to San Antonio. Witness told him, and he said "all right," and left. Two or three days before his arrest, defendant came again to the depot and inquired about cars, saying that he would want two cars. He left, saying that he would see witness later about the cars. On Friday, the day of the arrest of defendant, but before the arrest was made, Mr. Milnes, the depot warehouseman, notified the witness that defendant had applied for two cars to be supplied on the following Monday for the shipment of sheep. The sheep then claimed by defendant ranged about the depot. They were poor and not fit for market. Witness would not have shipped them without a guaranty of freight charges.

Cross examined, the witness stated that he did not understand clearly whether, when he said he would see the witness later, the defendant referred to the number of cars he would want or to the day he would want them. Defendant did not tell what sheep he intended to ship, nor could the witness say that defendant knew that he would not ship his sheep without a guaranty of freight charges.

David Milnes testified, for the State, that he was warehouseman at the Uvalde freight depot in September, 1886. About five o'clock on the day in that month that defendant was arrested, the witness was at Sansom's sheep pen, and saw the defendant who had just finished shearing for the day. He told witness to tell Volcker to have two sheep cars ready for him at one o'clock on the following Monday morning.

On his cross examination, this witness stated that, about two weeks before the conversation referred to, the defendant spoke to him about his purpose to ship some sheep, but did not say

how many cars he wanted, nor how many sheep he was going to ship. Witness knew that defendant had a mare, a black pony and a mule at Captain Sansom's place.

William Mitchell was the next witness for the State. He testified, in substance, that he worked with the defendant, shearing sheep, on the day the defendant was arrested. Witness quit work before the other hands got through shearing on that day. Some time, witness could not now say how long, before he quit work, the Mexican came to the pen and went to work near the stand where the defendant was at work. Witness saw the Mexican touch the defendant on the arm and walk off toward the barn, followed by the defendant. The two were gone about five minutes. Witness did not see where they went to. The witness was not at the pen when the Flowers sheep were brought there.

On his cross examination, the witness stated that Rodriguez helped to sack the wool before he and defendant walked off together toward the barn. Defendant went to the barn several times on that day before Rodriguez came to the pens.

W. E. Clark testified, for the State, that he went to Captain Sansom's place on the evening of September 16, 1886, to see defendant about some of his sheep in Mr. Benson's flock, of which witness had charge. Witness reached Sansom's place late in the evening. The Mexicans, Rodriguez and Merijildo, had just penned the sheep involved in this prosecution, and were in the corral with them. About that time the witness saw the defendant go through the far edge of the sheep from the Mexicans, to the cutting gate, where he proceeded to separate the shorn and unshorn sheep. He said nothing to any one, though he passed witness at a short distance. When defendant reached the cutting gate, which, on account of the noise, was out of hearing of the witness and the Mexicans, the witness asked the Mexicans where Captain Sansom got those sheep. Rodriguez replied: "They don't belong to Captain Sansom; they are Mr. Long's sheep." Witness then asked Rodriguez where Long got them, and he said that he did not know. The witness then asked Merijildo if he knew who owned the sheep. He replied that they belonged to the defendant. About this time Captain Sansom, who had joined witness, called to defendant, asking him who owned the sheep. Defendant evidently did not hear the question. Witness and Sansom then went to the cutting gate, and Sansom asked defendant again who owned the sheep. Defendant, without raising his head, replied that he did not know.

Nothing further was said about the sheep to defendant at that time. Witness and Sansom then went back to the Mexicans, and witness again asked Rodriguez about the sheep. Rodriguez replied: "Go to Mr. Long; he can tell you all about them; they are his sheep." After this conversation Captain Sansom went toward his house and the witness went to the cutting gate where defendant then was. Witness remarked to defendant: "That is a good bunch of sheep of yours"—referring to the sheep in the pen. Defendant replied: "They are not my sheep; I wish they were." About this time Captain Sansom returned and told defendant that, if an owner appeared and claimed the sheep, to offer two dollars a head for them in his behalf. A few words about the number and condition of the sheep followed, and witness had no further conversation with defendant about the sheep. Throughout the conversations described the defendant appeared very much confused and uneasy. He did not look the witness in the face a single time. He appeared to have trouble in cutting the shorn from the unshorn sheep, and permitted them to get mixed after the cutting. His evident purpose was to get the shorn sheep into the pen furthest from the barn, and the unshorn sheep into the pen nearest the barn. Finally Rodriguez asked if defendant wanted him to catch the sheep and separate them. Defendant replied that he did, and Rodriguez did so.

Cross examined, the witness said that Captain Sansom was not with him when he had the second conversation with the defendant about the sheep. In that conversation the defendant said that the sheep were not his, and that he did not know who owned them. Witness knew that the defendant owned some sheep, and that they generally ranged north, but sometimes west of the Uvalde depot. His sheep were poor, and in no condition to be shipped. A single-decked car would transport about one hundred and fifteen head of sheep. Some time before his arrest defendant told witness that when he got through shearing he was going to let his sheep out to Mr. McKinney on the shares, and that he was going to raffle off his fine mare.

B. C. Flowers testified, for the State, in substance, that his herder, one Montez, a Mexican, was shot to death by somebody on or about September 16, 1886, and witness's herd of five hundred and seventy-six head of sheep and fifteen goats, in Montez's charge, were driven off. They were taken from the range beyond Turkey creek, in Uvalde county, without the consent of the

witness. They were afterwards recovered by the witness at Captain Sansom's place, near Uvalde. .

Merijildo Erivisto was the next witness for the State. Being duly cautioned that he could not be compelled to testify to any fact tending to criminate himself, the witness testified, in substance, that he knew the defendant, and the Mexicans, Rodriguez and Nicholas Garcia, now in the penitentiary. On Wednesday, September 8 or 9, 1886, Rodriguez, riding the defendant's bay mare and leading his gray horse, came to witness's house and asked if witness wanted work. Witness replied that he did. Rodriguez then said that he would pay witness fifty cents a day and his board to go with him. Witness went with Rodriguez toward Eagle Pass until they reached the sheep camp of Mr. Flowers, where they stopped for the night with Nicholas Garcia and Remundo Montez, Mr. Flowers's shepherd. On the next morning witness and Rodriguez started on towards Eagle Pass, but, finding the road impassable because of the severe rain fall of the night before, they returned to Uvalde county. Witness and Rodriguez had no conversation about the sheep on that trip, but Rodriguez and Nicholas had a private talk in the view but not in the hearing of the witness. On the night of September 14, 1886, at about seven o'clock, Rodriguez again appeared at witness's house and asked witness if he wanted work. Witness asked him what kind of work. Rodriguez said that he wanted witness to go with him to get some mutton for Mr. Long, and was authorized to pay witness fifty cents a day and board. Witness told Rodriguez that he was willing to go, but had no horse. Rodriguez replied that Long had sent him a horse. On the next morning, before daylight, the witness, riding Long's black pony, and Rodriguez riding his own horse, started towards Eagle Pass. They soon reached the Mineto ranch, which was between Flowers's sheep camp and Uvalde. They stopped at that ranch for a while and then went on to Flowers's sheep camp, where they found Nicholas Garcia and Remundo Montez, the herder. Garcia and Rodriguez retired a short distance from witness and Montez, and had a private talk. On his return to the witness Rodriguez said that the muttons could not be obtained until the next day, and proposed to go back to the Mineto ranch, which he and witness did, and there passed the night.

On the next morning witness and Rodriguez went back to the Flowers camp, arriving there about ten o'clock. Neither Garcia

nor Montez were then at the camp, but Montez soon came in, and in a conversation with witness and Rodriguez mentioned the number of sheep in his charge. In a few minutes Rodriguez told the witness to go up the Eagle Pass road and wait for him. Witness did so, and was soon joined by Rodriguez and Garcia. The three then went to the Minsto ranch, where Rodriguez gave a gun to Garcia, and the two, Rodriguez and Garcia, left the ranch and went off across a hollow to look for muttons. Rodriguez soon returned, and said that the muttons could not be found, and he and witness went back to the Flowers camp. From that camp Nicholas and Rodriguez went off again, they said to get muttons, but returned soon and said that they could not cut the muttons out of the herd. Nicholas Garcia then said that it would be necessary to kill Montez, the herder, in order to get the muttons. Witness protested against the murder of the shepherd, and asked why it was necessary to kill him. Garcia said in reply that there were two or three sufficient reasons; one was to get the muttons, and another was because Montez had tried to kill him a day or two before, and the third was that he, Garcia was not making his first delivery of sheep, and that he had to get Montez out of the way. He then asked Rodriguez what he had to say about it, and Rodriguez replied sententiously: "Kill him!" Rodriguez then gave Garcia a pistol, which he said belonged to the defendant. Except the two or three appeals made by witness not to kill the herder, nothing more was said just at that time about the sheep.

The witness, with Garcia and Rodriguez, then went to the camp, and when Montez came in Garcia told Rodriguez to tie his, Montez's, arms behind him, which was immediately done. Garcia then told Rodriguez to walk on ahead. The party then started off, Rodriguez in advance, Garcia next, Montez next, with his arms tied behind him, and the witness bringing up the rear. They took Montez to a point about five hundred yards from the camp, and Garcia ordered him to kneel down. Montez knelt down, and Rodriguez ordered witness to shoot him. Witness refused, saying that Montez had never injured him. Rodriguez then said that if witness did not fire on Montez they would kill witness. The witness then fired at Montez, but not to strike him, and did not strike him. Rodriguez and Garcia then fired on and killed Montez, and then told witness that he was a party to the killing, and if he ever told it he would be killed either by them or the defendant. Witness, Garcia and

Rodriguez then went back to the camp, got on their horses, gathered the sheep, and started with them to Uvalde county, leaving the Flowers camp at nine o'clock in the evening, and traveling all night. Garcia came with them until the Nueces river was crossed, when he gave Long's pistol back to Rodriguez and turned back. A pistol was here exhibited to the witness, and he declared that it was the pistol, or one very like the pistol, used by Garcia in the murder of Montez, and which Rodriguez said had been furnished him by the defendant.

After Garcia left, and between the Nueces river and Sansom's place, witness asked Rodriguez why he did not tell him that he proposed to do murder to get the muttons, and that, if he had known he proposed to kill the herder in order to get them for Long, he would not have gone into the job. Rodriguez, in reply, said that Long told him to "get the sheep." He also told the witness that the agreement between himself, Garcia and Long was that Garcia was to deliver the sheep to him, he was to deliver them to Long, and Long was to ship and sell them, and the three were to equally share the proceeds. The water hole between Captain Benson's and the Uvalde depot was reached about three o'clock in the evening of September 16, 1886. At that point the sheep were stopped and left in charge of witness while Rodriguez went to Sansom's to see Mr. Long and get directions about the immediate disposition of the sheep. He returned in about an hour and a half with a bunch of sheared sheep, which he mixed with the Flowers muttons. Rodriguez then told witness that every thing was all right, and that Long was first going to shear the sheep and then ship them. The sheep were then driven to and placed in Sansom's pens. As soon as the sheep were penned Long went from Sansom's house to the cutting gate and went to cutting the sheared from the unsheared sheep. He did not say a word to either the witness or Rodriguez. Long and Rodriguez had some conversation after the shorn and unshorn sheep were separated, but witness did not hear what was said. Long then turned the shorn sheep and goats out the of pen, gave witness some buckets, and told him to drive the shorn sheep and goats to his ranch, and give the buckets to his shepherd. This was about sundown. Witness drove the goats and sheep to Long's ranch, took supper with Long's shepherd, and returned to the pens that night, and found Long and Rodriguez in custody.

On his cross examination the witness stated that he came

direct from the Uvalde county jail to testify in this case. He had been in jail for six and a half months, charged with the same offense for which the defendant was on trial. He came to tell the truth and the whole truth under promise that he would not be punished, but would be released, for so doing. Witness testified against Garcia and Rodriguez on their trials for the murder of the herder, and did so under the promise of the grand jury that he would not be prosecuted. He did not know whether the prosecution against him for this offense had been dismissed or not, but was told that it would be. The district attorney told witness that he would not be hurt if he told the whole truth about this transaction. Long never did say a word to witness about the sheep, except to order him to drive the shorn ones and the goats to his ranch, nor about the pistol. Witness did not borrow Long's horse, but the horse was brought to him by Rodriguez. He knew only what Rodriguez told him about the enterprise, and what he saw. Witness saw Captain Sansom and Mr. Clark at the sheep pens, and told them that the sheep belonged to defendant.

Sam Nimmo testified, for the State, that he was at Sansom's sheep pens when defendant and Rodriguez were arrested on the night of September 16, 1886. Rodriguez acted like he wanted to get out of the sheep pen. Sheriff Baylor stopped him, and Mr. Pulliam, who was present, found a forty-four or forty-five caliber pistol in the moral of his saddle.

The State recalled Mr. Sansom, who reiterated his testimony to the effect that he heard both of the Mexicans, after they got to the pens with the sheep, say that the animals belonged to defendant. Several witnesses introduced on behalf of the State examined the pistol in evidence and testified that, while they could not identify it as the pistol which belonged to the defendant, they knew that he owned one very, if not exactly, like it. Sheriff Baylor identified it as the pistol taken from Rodriguez immediately after his arrest.

The State closed.

Howard Pannell testified, for the defense, that he went to Sansom's pen late on the evening of September 16, 1886, to see defendant on some business. Sheep were not then being sheared, but witness saw some shorn sheep outside of the pen. He heard the defendant speak to Captain Sansom's Mexican, and asked him what he said to the Mexican. He said that he directed the Mexican to drive the shorn sheep to his ranch, and to direct his

45 — TEX. APP. XXIII.

herder to bring the others of his flocks to the pens. Witness had several times seen the Mexican Rodriguez riding the defendant's horses.

Bob Tilly testified, for the defense, that he worked with the defendant, sacking wool, on the sixteenth day of September, 1886, and saw Rodriguez when he went to the defendant's stand near the barn and helped him sack wool. He did not see Rodriguez do anything at that barn except sack wool. Defendant and Rodriguez did not go into the barn together, but Rodriguez stopped outside the barn until defendant took a sack of wool into the barn and came out with some sacks. He, Rodriguez, then went back to the pens, and did not enter the barn at all. He was not in the barn during the day. He and defendant did not talk to each other at, near, nor in the barn. Witness afterward stated that Rodriguez went into the barn after the defendant came out. Witness frequently saw Rodriguez riding defendant's horses after Sansom's sheep. Two or three weeks before the arrest of defendant, while witness was living at Mr. Tommerlin's, he heard a conversation between Ben Tommerlin, jr., and defendant, from which he gathered that defendant had lent Tommerlin a pistol for the use of Rodriguez, who then slept at Tommerlin's house. The pistol was to be used by Rodriguez in guarding Tommerlin's house. On the occasion referred to defendant came to get the pistol.

Witness was at Sansom's pens when the herd of sheep were brought there. He saw defendant when he was at the gate cutting out or separating the sheep. Captain Sansom and Mr. Clark may have been at the pen, but if so they had no conver sation with defendant in the hearing of the witness. Witness heard Tommerlin, who was present, ask defendant who owned those sheep. Defendant replied that he did not know.

Ben Tommerlin, jr., testified, for the defense, that he had sev eral times seen Rodriguez riding defendant's horses, and he had as often seen defendant riding Rodriguez's horse. Witness once had defendant's pistol borrowed. Some time before September 16, 1886, defendant and Rodriguez came to witness's camp to get the pistol. Defendant said that he wanted it for Rodriguez, who was going down the country after some of Sansom's sheep. Bob Tilly was not at witness's camp on that occasion.

Doctor Taylor Hudson, the defendant's brother-in-law, testified in his behalf that he owned the flock of sheep in Uvalde county controlled by the defendant, and, some time before the

arrest of the defendant, directed him to sell them, and to use his discretion about selling them in flock, or separating the muttons from the ewes and shipping them to market.   About the last of August or the first of September, 1886, the witness wrote defendant to sell the sheep, without longer delay, for the best price he could get for them.   Witness had a conversation with Captain Sansom during the last term of the district court, in the course of which Sansom said that he asked defendant who owned the sheep involved in this prosecution, and that defendant told him that he did not know, but that they did not belong to him. He said in the same conversation that, when defendant applied to him for leave of absence for the Mexican to go to Eagle Pass to see his brother, the defendant said that the Mexican wanted to borrow his, defendant's, horse, and that he, defendant, wanted to know if he should lend the horse, and that he, Sansom, told him to do so.

The motion for new trial raised the questions discussed in the opinion.

*Baker & Archer* and *Pollard & Clark*, for the appellant :   The court erred in permitting the witness Will E. Clark, over the objections of defendant, to testify as to a conversation (not in the hearing of the defendant) he had with the two Mexicans, Rodriguez and Merijildo, at the pen where the sheep and goats were, in reference to whose sheep they were, in which conversation said Mexicans stated that the sheep belonged to defendant Long, and on being asked the second time, in the same conversation, as to whose sheep they were, made the same reply and referred the witness to defendant and told him to ask defendant.

First, the evidence is not admissible, being hearsay evidence, and the statements therein were not made in the presence or hearing of the accused.

Second, the evidence should not have been admitted as a statement of an accomplice to bind defendant, because no proof of a conspiracy had been made.

Third, the State, having proved by its own evidence that the defendant disclaimed any ownership of the sheep and goats, and not having introduced any testimony showing that his statements in relation thereto were false, on the contrary, that he was then engaged in separating ("cutting out") the shorn sheep of his from the unshorn (or stolen) sheep and goats, it could not

establish a conspiracy by the acts and declarations of another than the defendant.

Fourth, and lastly, the testimony sought to be elicited, and which was elicited by the testimony of this witness, was the declaration of principals in the theft after all the ingredients of the offense had been accomplished by each of them.

This being the first witness by whom the State attempted to prove the declarations of one not the defendant and not in his presence, if admitted at all, should only have been admitted after the State had proved a conspiracy on the part of this appellant with the parties whose declarations were sought to be elicited, to commit the alleged offense; or, at least, after testimony had been adduced tending to prove such.

The only testimony offered by the State up to this period in the trial was the testimony of J. W. Sansom and of the witness Clark. Sansom testified that defendant came to him as he (defendant) represented, at the instance of his Mexican herder, Rodriguez, to get his (Sansom's) permission for the herder to go to Eagle Pass to see a sick brother, which was granted; to the disappearance of the herder for a few days; his return to Uvalde, remaining there a short while; second disappearance from Uvalde, and his second return on Friday, the sixteenth day of September, 1886—his going to where defendant was engaged in shearing his sheep; that he gave to defendant a secret punch, and that thereupon defendant and the Mexican went inside of a barn or stable connected with the sheep pen where defendant was so engaged—there having a conversation which he did not hear—and after defendant had finished shearing his sheep his application to Sansom for permission to use this same Mexican to send by him his shorn sheep to his flock, and that he did so send him off with his sheep; that afterward defendant and himself went into his house, and about dark that evening he saw a large herd of sheep being driven into his (Sansom's) pen that defendant had been using for shearing; that defendant came out, passed through the sheep, and without saying anything, went to the cutting gate and commenced to cut, and did finally separate his flock of shorn sheep from this large herd of unshorn sheep and goats, and while so engaged this conversation with the Mexicans occurred.

The witness Clark testified that he came up after the sheep and goats had been driven in the pen, saw defendant come out of the house or from that direction, pass around the herd

and go directly to the cutting gate, commenced cutting (separating) the shorn sheep (his own) from the rest of the herd, and while so engaged the conversation attempted to be elicited occurred with the Mexicans who were with the sheep. Both witnesses testify that defendant, Long, disclaimed any ownership of the sheep. And both witnesses testify that this was about dark on the sixteenth of September, 1886; and B. C. Flowers, the owner, testified that the sheep and goats were taken from the possession of his herder on Turkey Creek, some distance from the place where they were afterward found on that day, and taken the day before Sansom and Clark saw them.

The application of defendant to Sansom on behalf of the Mexican, was September 7—ten days before the theft of the sheep and their being penned.

This testimony was objected to at the time by defendant, and the ruling of the court excepted to. The defendant also moved the court to exclude the same after the State had closed its testimony, and the ruling of the court refusing to exclude was excepted to. (1 Greenl. on Ev., sec. 111, 14 ed.; Whart. Crim. Law, 702; Cox et al. v. The State, 8 Texas Ct. App., 300.)

As to sufficiency of proof of conspiracy, see Hodde v. The State, 8 Texas Court of Appeals, 385. On other points: Smith v. The State, 21 Texas Court of Appeals, 120; Phillips v. The State, 6 Texas Court of Appeals, 364, 383; Simms v. The State, 10 Texas Court of Appeals, 132, 165.

Second, the court erred in permitting J. W. Sansom, over the objection of defendant, to testify to a conversation (not in the hearing of defendant) he had with two Mexicans, Nickenor Rodriguez and Merijildo, on the day of defendant's arrest, in reference to the ownership of the sheep, then in the pen of witness, in which conversations said Mexicans stated that the sheep belonged to the defendant, Long; and, on being asked the second time, in the same conversation, as to whose sheep they were, made the same reply, and one of them, Nickenor, told witness to go to Long and ask him.

This assignment embraces the same proposition and involves the same facts as in the first assignment, and the same authorities are referred to, as the conversation was the same testified to by the two witnesses, Sansom and Clark.

The court erred in permitting the witness Merijildo to state the conversation he had with the Mexicans, Nickenor Rodriguez and Nicholas Garcia, in reference to going for and procuring the

sheep alleged to have been stolen, and which conversation wit-
ness was permitted to detail. Said evidence was an attempt to
corroborate the statements made by an alleged conspirator, and
the acts and declarations of a conspirator, by a conspirator, and
were not made in defendant's presence or hearing.

Hearsay testimony, as this was, was inadmissible, not having
been elicited in presence of accused, nor any evidence adduced
to prove a conspiracy on the part of appellant with these two
Mexicans, Rodriguez and Garcia. There was no testimony con-
necting this defendant with Rodriguez, further than to apply to
Sansom for this Mexican for permission to go to Eagle Pass to
see a sick brother. On his return no conversation or act with
defendant was proved, nor any fact connecting this defendant
with the commission of the offense proven. True, the Mexican
returned on the day of defendant's arrest to the pen where de-
fendant was shearing sheep; and, according to the testimony of
Sansom, had a conversation which he did not hear, went off
with defendant's shorn sheep and returned about dark with the
shorn sheep mixed up in a flock of unshorn sheep and goats;
that a conversation was had by Sansom, and was had between
the witnesses Clark and Sansom with the Mexican Rodriguez and
this witness, in which they state the sheep were defendant's, and
defendant disclaimed ownership of the sheep, and said "They
are not mine; I wish they were," cut out the unshorn sheep of his
from the shorn sheep, sent them to his flock, leaving the stolen
sheep in witness Sansom's pen, where they were taken by the
sheriff. There was no testimony that defendant ever saw the
Mexican Garcia at all, or had any connection with him on any
subject.

Conviction can not be had upon the unsupported or uncorrob-
orated testimony of an accomplice. Nor can one accomplice cor-
roborate another. The parties Rodriguez and Garcia are now
in the penitentiary for life for the murder of the herder in charge
of the sheep here alleged to have been stolen. This witness
was, up to the very moment of his going upon the stand, in-
dicted for this very identical theft. His improbable story as to
the statements made to him by the grand jury and district attor-
ney, and his own statements, stamp him as an accomplice, if not
a principal in this murder; and, without the testimony of this
witness, there is not a single fact proven connecting this defend-
ant with the offense. (See comments of court on this character

of a witness in Barrett v. The State, 18 Texas Ct. App., 68.) This witness says he never had any conversation with Long.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant has been convicted of the theft of sheep and goats. The theory upon which the prosecution rested was that appellant was guilty by reason of a conspiracy entered into by and between himself, Nickenor Rodriguez and Nicholas Garcia, and that the theft was committed through the manual agency of these two co-conspirators and another Mexican, whom these latter had employed. It was not claimed that appellant was actually present and participating.

Certain statements and declarations of these two associates were admitted in evidence. These tending to implicate the defendant, and not being made in the presence of appellant, it became necessary to show a conspiracy as a predicate for their introduction.

The evidence on this head tended to show that, for some days previous to the taking, Rodriguez and appellant were seen frequently conversing together, apart from others; the loaning of his pistol by appellant; the intercession with the Mexican's employer to get for him a leave of absence to visit a sick brother; the fact that he did not make his visit; his riding about the country, and his frequent returns to appellant between the time of his release and the bringing in of the stolen property; the killing of the Mexican herder; the fact that one of the conspirators was seen riding one of appellant's horses shortly before the taking; the arranging for the shipment by rail of two cars of sheep, etc. The facts alluded to, as well as others in the record brought up, must be held to establish the conspiracy to commit the theft, and also appellant's participation therein.

The State's theory was that the property was intended to be shipped. This not having yet been done, the statements and declarations of his co-conspirators were admissible, since the purpose of the conspiracy was still incomplete.

The question raised on the fifth assignment of error does not arise on the record, and is not here discussed. The doctrine of the Nolen and the Wood cases (9 Texas Ct. App.) are not in point, and do not support appellant's sixth assignment of error.

The writer of this opinion does not, under the facts, hold the appellant to be a principal. His views upon this question were

expressed at some length in the Smith case (21 Texas Ct. App., 106), and he does not feel called upon to renew the discussion here. Former rulings of this court hold him to be a principal, and this opinion so holds him.

Other assignments of error have received careful consideration and are not deemed well taken. The judgment is affirmed.

*Affirmed.*